LOUISA H. HJELM, ADMINISTRATRIX, APPELLEE, V. JOSEPH B. VOLZ, APPELLEE; SWIFT & COMPANY, APPELLANT.

FILED JUNE 10, 1910.    No. 16,079.

1. **Appeal: VERDICT: CONCLUSIVENESS.** Where there is a sharp conflict in the evidence as to a material fact in a case, the verdict of the jury must ordinarily be taken as conclusively settling for a reviewing court that the testimony of the witnesses for the prevailing party as to the disputed fact reflects the actual conditions.

2. **Master and Servant: CONTRIBUTORY NEGLIGENCE: QUESTION FOR JURY.** Whether a workman was guilty of contributory negligence in entering a cylinder containing a revolving shaft with arms, at a time when the shaft was out of gear, and after the foreman and other employees in the building where the machinery was used had been informed of the fact that he would enter at that time, was a question for the jury, and their finding in that respect will not be set aside.

3. ————: ASSUMPTION OF RISK: QUESTION FOR JURY. And so, also, under such circumstances, as to the question whether he assumed the risk of so doing.

4. ————: FELLOW SERVANTS. In this state what is known as the "department rule" as to fellow servants is in force. *Union P. R. Co. v. Erickson,* 41 Neb. 1, followed.

5. ————: ————. Under this rule, evidence examined, and *held* that the deceased, who was a millwright working in any part of the packing plant as directed, and an oiler, employed only in the fertilizer dryer house, were not fellow servants.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Affirmed.*

*Greene, Breckenridge & Matters,* for appellant.

*Henry C. Murphy* and *James C. Kinsler, contra.*

Letton, J.

This action was brought by the administratrix of the estate of Carl Hjelm, deceased, on behalf of the widow and next of kin to recover damages for the wrongful killing of the deceased. The petition is lengthy, but in substance it alleges that the deceased was a millwright in the employment of the defendant, Swift & Company, in its packing house at South Omaha, Nebraska; that on July 20, 1906, he was directed to fasten a bar attached to a revolving shaft in a dryer used in the fertilizer department. To do so it became necessary for him to enter the dryer, which is a large iron cylinder inclosed in an outer cylinder, and between the outer and inner cylinders steam is admitted for the purpose of heating the contents of the inner cylinder. The shaft is caused to revolve in the inner cylinder by a gear wheel outside of the dryer actuated by a small pinion moved by means of a clutch pulley. That in order to cause the shaft to revolve it is necessary to pull or throw a clutch against the pulley, and that attached to the clutch for the purpose of moving it is an iron lever about $3\frac{1}{3}$ feet long; that a lever stand is adjacent, upon which the lever rests, and upon which it slides in order to engage or disengage the clutch; that when the appliance was originally constructed there was attached to the lever stand a lock and chain by which the lever could be held so that it would be impossible for the pulley to become engaged and the shaft to revolve when it became necessary for any one to go inside the dryer, but that at the time that deceased was ordered to go into the cylinder and make the repairs the lock and chain had been broken off or removed; that there was no other means provided to fasten the lever; that by reason of the lock being absent the dryer was in an unsafe and dangerous condition, and was an unsafe place to work, unless the clutch lever was securely fastened; that defendants failed to instruct him regarding the danger. It is further alleged that after Hjelm entered the dryer the

machinery was started through the negligence of the defendants; that he was caught therein and injured, and that he died within a short time.

The defendant company filed an answer, admitting that Hjelm was in its employment and that it was his duty to make repairs in the dryer.  It alleged that the dryer was properly equipped and was provided with a lock and chain; pleads that Hjelm assumed the risks of the service which were open and obvious; avers that if the negligence of any other person contributed to the injury such negligence was that of a fellow servant of said Hjelm working about said dryer, who carelessly and accidentally started said dryer without inquiry as to the situation of the said Hjelm; and avers that he was guilty of negligence himself in entering the dryer without securely fastening it. A motion was made by the plaintiff to require defendant to set forth more specifically the name of the person referred to as a fellow servant who started the dryer and in what respect his action was careless and negligent. This motion was sustained, and thereafter the defendant filed an amended answer substantially the same as the former, except that in the fifth paragraph thereof it pleaded: "If the negligence of any person other than that of the said Carl Hjelm, deceased, in any manner contributed to the injury resulting in the death of said Carl Hjelm, such negligence was that of Mads Englund or Joe Opocenski, or some other fellow servant of said Hjelm, working about said dryer, who carelessly or accidentally started said dryer in motion without inquiry as to the situation of said Hjelm, whose presence in the dryer would have been apparent to the most casual observer." For reply to this allegation the plaintiff admitted that the dryer "was carelessly and negligently started in motion by Joe Opocenski," but denied that Opocenski was a fellow servant of Hjelm.  The reply further specifically denied all the affirmative allegations of negligence of deceased in the answer.

The evidence shows that there were three dryers in the

same room, which was in a three-story building known as
the "fertilizer dryer"; that the main-line shafting was on
the third floor; that from this shaft the power was com-
municated by means of a clutch pulley and belt to a line
of shafting on the second floor, from which separate belts
were run through the floor to each dryer on the first floor.
The pulley to which these belts ran was caused to engage
and operate the gear wheel on the end of each dryer by
means of a clutch operated by a lever which worked hor-
izontally. When the machinery was first received no
fastening was provided for this lever, but under the direc-
tion of Mr. Branstad, master mechanic, a chain was bolted
to the frame upon which the lever rested and a padlock
furnished, by which, when the lever was drawn to the
south end of the lever stand throwing the clutch out of
gear, it might be locked. This would render it impossible
to start the dryer shaft. The key was kept in the office
of the fertilizer foreman. The day before the accident
the operation of the dryer had been stopped on account
of the pounding of a bar in the inside. This was reported
to the master mechanic, who directed the deceased and
one Mads Englund, another millwright, to make the
necessary repairs. Englund testifies that in the evening
when Hjelm and he went to the dryer for that purpose
they found that it was too hot to go into. They then went
up to the second floor and found Dreamel, Sterba, and
Opocenski. Dreamel was the head of the fertilizer de-
partment, Sterba was the foreman in the dryer room, and
Opocenski was the oiler in that building. Hjelm told
Dreamel that the dryer was too hot. Dreamel then told
him to leave it until the next morning. Both Sterba and
Opocenski were present at this conversation. The next
morning Hjelm and he went back to work. It was dark
at the north end of the dryer where the hole was through
which it must be entered, so they took an incandescent
light upon an extension wire and looked in. At that time
the shaft was set so that one of the arms stood across the
center of the manhole. Englund then went to the south

end and started the machinery, making the shaft move a little, and, as soon as the arm had passed the hole, Hjelm called to him and he threw the lever out and stopped it. He then pushed the lever over as far as he could get it and pushed it down over the edge of the stand. He testifies that there was then no lock or chain attached to the lever stand; that at one time he had seen a lock and chain there, but it was not there at this time. He says that he then went to the north end of the dryer; that Hjelm then went to the water-closet; that the witness went into the dryer, found it so hot he could not work, came out, and went to the third floor to get some sacks to lie upon while working in the dryer; that while on that floor he saw the oiler, Opocenski, throw out the clutch lever on the mainline shaft; that Opocenski then went down stairs ahead of him to the first floor, and that just as he came down he saw Opocenski jump upon the concrete base of No. 3 dryer, and saw the big gear wheel moving a little. He testifies: "I say to Joe, 'What are you doing?' Q. You said, what are you doing? A. Yes, sir. He say, 'I want to stop the power.' Q. Which way did he have the lever, with respect to his hand? A. His hand was on the lever, the clutch lever. Q. And which way did he have the lever? A. He got the lever clear into the clutch.", Englund asked him if he was sure nobody was in the dryer, and he said there was not. Opocenski then threw the lever to the south and threw the clutch out. Englund then heard some one calling; he went to the north end of the dryer, and found Hjelm caught in the cylinder. He went back to the gear wheel, and with Opocenski's help turned the wheel, so that the arm of the shaft cleared the opening and they could pull Hjelm out. On cross-examination he testified that about six or eight weeks before the accident he had seen a lock and chain on the lever stand; that on the morning of the accident he saw a small chain on the north end of the lever stand hanging down in the dust, but he saw no lock there; that when he saw Opocenski he had hold of the clutch lever holding it into

gear.   The power had been turned off upstairs, but the dryer was still running, the shaft moving only a little. It seems that, in order to "stop the power" after the clutch was thrown out on the upper floor, the dryers or some of them if not in gear would be thrown in, so as, by increasing the load, to check the running of the shafts and pulleys.   Since this testimony of Englund's forms the basis of the plaintiff's case, it will be unnecessary to consider in detail all of the testimony of defendant's witnesses, and we only consider such of it as elucidates the particular point under discussion.

1. The first point made by appellant is that the dryer was suitably equipped with a safety device.   Counsel vigorously insist that there is no proof as to the lack of a lock and chain, as well as of a number of other facts essential to recovery; but this is evidently based upon the idea that the testimony of the witnesses for the defendant is true in all respects, and that much of that in behalf of the plaintiff is not worthy of belief.   With this idea, the jury evidently did not agree, and, since the matters in which the testimony conflicts have been settled by the jury in favor of the plaintiff, we must assume those facts established which were testified to by the plaintiff's witnesses.   There is a sharp and direct conflict in the testimony as to whether or not there was a lock on the chain at the lever stand on the morning of the accident.   The testimony of Englund, Washington, and Beatty is in direct contradiction to that of Branstad, Volz, Russell, and other witnesses for defendant.   The jury, however, has settled this controversy, and must have found that the story of the plaintiff's witnesses was true, and we are not at liberty to interfere with their finding in that respect, even though from the inanimate page we might think there was grave reason to doubt the statements.   It may be considered as established, therefore, that there was no lock on the lever stand at the time of the accident, and it is clearly shown that the lock was a necessary and proper appliance in order to prevent just such accidents.

2. As pointed out in appellant's brief, while there is a clear distinction between assumption of risk and contributory negligence, it often happens that both of these principles may be applicable to the same facts. In this case if the machinery had·been in gear when Hjelm entered the dryer, he would have assumed the risk of it starting, and would also have been guilty, under ordinary circumstances in working hours, of contributory negligence which would bar recovery. But the machinery was not in gear at the time, and whether the lock and chain were in place or not, it was for the jury to determine whether the fact that Hjelm went into the dryer without fastening the gear wheel in some manner was negligence. In this connection they were·entitled to consider the fact that on the evening before he had informed the only men in the building whom the evidence shows had anything to do with the control of the machinery therein that he was going into the dryer the first thing in the morning. The question whether after taking this precaution he was negligent in entering the dryer without fastening the gear wheel so that no one could start the machinery, and the question of whether he assumed this risk have been settled by the verdict.

3. The principal issue left in the case, then, is whether the act of setting the dryer in motion was, as the defendant pleads, the "negligence  *  *  *  of Mads Englund or Joe Opocenski, or some other fellow servant of Hjelm, *  *  *  who carelessly or accidentally started said dryer in motion without inquiry as to the situation of said Hjelm, whose presence in the dryer would have been apparent to the most casual observer." After the case had been submitted to the jury, the following question in writing was received by the court: "To the Court: If the jury agrees that the oiler started the machinery by throwing in the clutch on the shaft that operated No. 3 dryer, and was thereby responsible for the death of Hjelm, would that sufficiently relieve said Hjelm from responsibility, if in the judgment of the jury or any of them he

did not use ordinary care to make the machinery safe before going into the dryer, No. 8 and No. 10 of the instruction of the court seeming to the jury to conflict at this point?"

The court answered this inquiry by an additional instruction as follows: "A master has a right to assume that an employee will use that ordinary care and caution that an ordinary prudent and careful man would use when going into a place of danger, and an employee has a right to assume that, when going into a place of danger, the master will use that care and caution an ordinary careful and prudent man would use in keeping the premises reasonably safe for an employee to work. If the plaintiff has satisfied you by a preponderance of the evidence that the deceased notified the fertilizer department that he was going into the dryer on the morning of the injury, and, notwithstanding said knowledge, said oiler carelessly and negligently turned on the power and thereby caused the death of the deceased, and you further find said oiler was not a fellow servant of the deceased, then you are instructed that the defendant would be liable for the death of the deceased, even though the deceased did not use ordinary care in going into said dryer."

The defendant complains that this "took from the jury every question in the case save only the right to find that Opocenski, the oiler, started up the machinery, and that he was not a fellow servant," but in our view of the issues and of the evidence this is the pivotal question in the case. Even if a lock had been furnished and not used, if, as Englund testifies, those in charge of the dryer house and the oiler, Opocenski, had been told in the evening that the men were going into the dryer that morning, then, if Opocenski, having this knowledge, carelessly started the dryer, his master would be liable, if he were not a fellow servant of the deceased.

This brings us then to the final question, which is whether, as alleged in the answer, Opocenski was a fellow servant with Hjelm. The evidence shows that the

mechanical department included millwrights, elevator conductors, and oilers; that there are six elevator conductors employed, whose occupation it is to operate the elevators in the various buildings of the plant and who have nothing to do with repairs; that there are five regular day oilers who are assigned to the different buildings, and one of whom, Opocenski, was assigned to the fertilizer dryer house. It is the duty of the oiler in the dryer house to. oil the machinery on all three floors of the building and on the top of the building, to start and stop the machinery under the direction of the fertilizer foreman, to do slight repairs and correct minor irregularities in the running of the machinery in that building. His time is kept by the fertilizer department; he is on the pay roll of that department and receives checks charged to it. His whole time is occupied in the dryer building. When repairs such as the tightening of bars in the dryer or other work around the machines are needed, the defect is reported by the fertilizer foreman to the millwright foreman, and men of the regular millwright force are sent to do the work. While such repairs are being made the oiler attends to his regular duties in the building, and does not form one of the millwright gang. The deceased and other members of the regular millwright force were in no way under the direction and control of the fertilizer department. Their duty was to install, repair, or demolish machinery as required in any of the numerous buildings composing the packing plant. They were directed solely by the millwright foreman, and were employed strictly in the occupation or trade known as that of "millwright," which is a calling demanding mechanical skill of rather a high degree. The duties of the oiler were of a character which could be performed by persons of a lower degree of mechanical skill. His services were all rendered in or about the fertilizer dryer building to which he was assigned. He was under the immediate direction of the foreman of that building, and in a remoter degree was also under the direction of the mechanical department, but his most im-

portant duties respecting the working and stopping of the machinery, etc., were directed by the fertilizer foreman. He was not consociated with the millwrights in the same task. At the time of the accident there was no community of action between the millwrights, who were engaged in repairing the dryer under the direction of the millwright foreman, and the oiler who stopped the power, which was a part of his regular duties. Their spheres of activity, while connected in the sense that the duties of both were concerned with machinery, and that the oiler was to some extent under the direction of the millwright foreman, were separate and distinct, and as we have seen even when working in the same building they were not associated. It is clear that these servants were not so associated together in the same lines of employment as to constitute fellow servants under the rule adopted in this state, which is commonly known as the "department rule." *Norfolk Beet-Sugar Co. v. Koch,* 52 Neb. 197; *Union P. R. Co. v. Erickson,* 41 Neb. 1. This is the rule here, and, while rejected in a number of other jurisdictions with courts of high standing, we are not inclined to depart from it. Under this rule it is a question of fact for the jury to determine whether the persons involved are fellow servants. They have determined that Opocenski and Hjelm were not fellow servants, and their finding is fully supported by the evidence.

We have been cited by the defendant to a number of cases where this court has held that the person injured had assumed the risk of his employment, and to others where the servant had been guilty of contributory negligence sufficient to bar recovery, but the facts in the cases cited are so different from those in the instant one that the holding in those cases that as a matter of law the employer was not liable is no justification for such a holding here.

Under the facts testified to in the case, we find no prejudicial error in the instructions complained of. The judgment of the district court, therefore, is

AFFIRMED.